**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VICTOR GRANADOS and ELIZABETH GARCIA on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

ZOCDOC, INC.,

*Defendant*.

Case No. 1:26-cv-00554-KPF

FIRST AMENDED CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

Plaintiffs VICTOR GRANADOS and ELIZABETH GARCIA ("Plaintiffs") bring this class action complaint (the "Action") on behalf of themselves and others similarly situated for violations of federal, state, and common law against Defendant, ZOCDOC, INC. ("ZocDoc" or the "Defendant") upon personal knowledge as to themselves and their own actions, information and belief, and the investigation of their counsel, seeking actual damages, statutory damages, restitution, disgorgement of profits into a constructive trust, pre- and post-judgment interest, reasonable costs and attorneys' fees, a declaratory judgment, injunctive relief, and any other relief this Court deems just and proper, as follows:

## INTRODUCTION

1. Plaintiffs and Class members are medical patients who have used Defendant's website, *www.zocdoc.com*, within the statutory period to book doctors' and other types of medical appointments through the ZocDoc website.

2. Defendant offers services related to medical care: patients seeking appointments with medical professionals (usually doctors, but also nurse practitioners, therapists, etc.). The data associated with appointments is highly sensitive because it involves the collection of

medical information as well as the initial stages of what could become a diagnosis (so that the patient knows what sort of doctor or healthcare professional to visit). For example, if a user of Defendant's website is seeking care due to stomach pain, associated symptoms might be entered into the website which ultimately refers a gastroenterologist; to do this, the website must combine identifiers (*e.g.* the patient's name, connected accounts including their email address, and their internet protocol address) together with the searches or appointments booked on Defendant's website and medical information including symptoms, illnesses, and other information to refer the patient to the correct medical provider.[1]

3. Defendant's medical services come with a reasonable expectation of privacy because of the sensitive nature of the PII provided, and thus Defendant's website users have the very same privacy rights as those who physically walk into providers offices. With that in mind, ordinarily, a patient would have to consent to the presence of other third-parties looking over their digital shoulders or being in a

[1] Taken together with personally identifiable information such as a customer identifier, internet protocol address, or other information which identifies a specific person, the "PII."

waiting room along with them as they transact business with and provide PII to a medical provider, as is the case here.

4. However, rather than protect their PII, Defendant allows third parties, to collect, retain, and use patient data without adequate and sufficient consent from Plaintiffs and Class members using tracking technology embedded in website code. The existence of the trackers used by third parties on the website is a breach of patient privacy. For example, Branch.io, a marketing campaign platform which provides advertising services using data collection, behavioral analysis, and user targeting, uses trackers to collect data on numerous pages on Defendant's website, including collecting data from search results pages when patients review suggestions for specific types of providers. Other data collectors with trackers on Defendant's website include OutBrain, Sentry, SpeedCurve, and Google – all of which are unauthorized third parties peering over the digital shoulders of Plaintiffs and Class members when they book doctors' appointments and seek medical care.

5. Incredibly, and as discussed below, Defendant updated their Privacy Policy essentially admitting to all of the allegations in the initial version of this complaint. Even so, the revised version of the Privacy

Policy remains intentionally opaque and vague so that Plaintiffs and Class members cannot possibly know about the depths of Defendant's sophisticated and secretive system of violating the privacy rights of their patients.

6. As such, Defendant has blatantly invaded or allowed for the invasion of Plaintiffs' and Class members' privacy rights by third parties. Plaintiffs seek to rectify these harms under federal, state, and common law causes of action, pursuing actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, reasonable costs and attorneys' fees, a declaratory judgment, injunctive relief and any other relief this Court deems just and proper.

## **JURISDICTION and VENUE**

7. *Subject Matter Jurisdiction.* This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as well as pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). As required by CAFA, the amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class members, and minimal diversity exists because one

or more putative Class members are citizens of a different state than Defendant. Namely, numerous members of the putative Class are domiciled in states around the country other than New York, including Plaintiff Elizabeth Garcia who is domiciled in California.

8. Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims which are anchored by Plaintiffs' Electronic Communications Privacy Act claim.

9. *Personal Jurisdiction.* This Court has personal jurisdiction over the litigants because Plaintiff Victor Granados is located in New York, Defendant is headquartered in New York, Defendant is registered to do business in New York, Defendant's acts or practices were directed toward this State (and thus, Defendant intentionally availed itself of this jurisdiction by choosing to do business in New York) and, since the ZocDoc website is used throughout the United States, Defendant knew or should have known that tracking technologies were being used to intercept the actions of Class members in New York.

10. *Venue.* Venue is proper because Defendant is headquartered in and conducts business in this District, (2) Defendant's acts or omissions were directed toward this District, (3) a substantial part of the

events, acts and omissions giving rise to Class members' claims occurred here, and (4) because Class members were harmed here.

## PARTIES

### PLAINTIFFS

***Plaintiff Victor Granados***

11. Plaintiff Victor Granados is domiciled in the state of New York.

12. During the relevant period, Plaintiff Victor Granados visited Defendant's website to book medical appointments, including doctors' appointments. Plaintiff Victor Granados provided his location, information based off of the care he sought, and his insurance information to Defendant by way of its website. Additionally, Plaintiff Victor Granados filled out a questionnaire which also collected specific medical information, including medical symptom-related data.

13. In fact, Plaintiff Victor Granados' use of Defendant's website included the providing data which was about as sensitive as could be. Plaintiff Victor Granados booked a variety of different appointments including for psychiatric care, dental work, gastroenterology, plastic surgery, optometry, primary care, podiatry, internal medicine, and

dermatology in from April 6, 2016 through December 5, 2025, using Defendant's website for treatment of a slew of different medical ailments for which each appointments at specialist and primary care doctors were booked. Indeed, Plaintiff Victor Granados' search queries and selections on Defendant's website included those which sought all sorts of different sensitive types of healthcare.

14. While on Defendant's website, Plaintiff Victor Granados was entirely unaware that he was being tracked; Defendant's website collects identifiers as well as medical data for advertising and other resale purposes by third parties.

15. Not only was Plaintiff Victor Granados not adequately informed about the sale of his data to these third parties, but he was not adequately given compensation for his sensitive and valuable information.

16. Plaintiff Victor Granados has suffered the following injuries from (1) the interception of his private and valuable data, (2) the disclosure of his private and valuable data to unauthorized third parties, and (3) the failure to justly compensate Plaintiff Victor Granados for his valuable information:

a. The loss of value of personally identifiable information and/or protected health information that might be associated with Plaintiff Victor Granados's visits to Defendant's website;

b. Intrusion upon Plaintiff Victor Granados' and Class members' privacy on Defendant's website where it was reasonable for Plaintiff Victor Granados' and Class members to have an expectation of privacy;

c. Lack of compensation for the sale of Plaintiff Victor Granados' and Class members' data; and

d. Profiting from the sale of Plaintiff Victor Granados' and Class members' data in a way that would be inequitable sans disgorgement of profit.

17. Had Plaintiff Victor Granados known about the surreptitious collection and tracking of his PII, he would not have used ZocDoc's website.

***Plaintiff Elizabeth Garcia***

18. Plaintiff Elizabeth Garcia is domiciled in the state of California.

19. During the relevant period, Plaintiff Elizabeth Garcia visited Defendant's website to book her medical appointments, including therapy and doctors' appointments. Plaintiff Elizabeth Garcia provided her location, the care she sought, and her insurance information to Defendant by way of its website. Additionally, Plaintiff Elizabeth Garcia filled out a questionnaire which also collected specific her medical information, including medical symptom-related data.

20. In fact, Plaintiff Elizabeth Garcia's use of Defendant's website included the providing data which was about as sensitive as could be. Plaintiff Elizabeth Garcia, in December of 2025, booked appointments for her mental healthcare through a therapist and psychiatric provider, using Defendant's website for treatment of anxiety and depression. Indeed, Plaintiff Elizabeth Garcia's search queries and selections on Defendant's website included those which sought mental healthcare.

21. While on Defendant's website, Plaintiff Elizabeth Garcia was entirely unaware that she was being tracked; Defendant's website collects identifiers as well as medical data for advertising and other resale purposes to third parties.

22. Not only was Plaintiff Elizabeth Garcia not adequately informed about the sale of her data to these third parties, but she was not adequately given compensation for her sensitive and valuable information.

23. Plaintiff Elizabeth Garcia has suffered the following injuries from (1) the interception of her private and valuable data, (2) the disclosure of her private and valuable data to unauthorized third parties, and (3) the failure to justly compensate Plaintiff Elizabeth Garcia for her valuable information:

a. The loss of value of personally identifiable information and/or protected health information that might be associated with Plaintiff Elizabeth Garcia's visits to Defendant's website;

b. Intrusion upon Plaintiff Elizabeth Garcia and Class members' privacy on Defendant's website where it was reasonable for Plaintiff Elizabeth Garcia and Class members to have an expectation of privacy;

c. Lack of compensation for the sale of Plaintiff Elizabeth Garcia and Class members' data; and

d. Profiting from the sale of Plaintiff Elizabeth Garcia and Class members' data in a way that would be inequitable sans disgorgement of profit.

24. Had Plaintiff Elizabeth Garcia known about the surreptitious collection and tracking of her PII, she would not have used ZocDoc's website.

## DEFENDANT

### ***Defendant ZocDoc, Inc.***

25. Defendant ZocDoc, Inc. is a Delaware corporation with its principal place of business located in New York, NY.

26. ZocDoc is a sophisticated business that provides medical services to patients for the purpose of booking medical appointments and other medical services based off of searches as well as questionnaires which target specific providers based off patient data.

27. In the course of doing business, Defendant maintains a website at the following URL address: *www.zocdoc.com*. This website is used by patients seeking medical care, like Plaintiffs and Class members, to medical services from doctors and other providers which partner with Defendant's business.

## FACTUAL ALLEGATIONS

### *Defendant's Business and Privacy Representations*

28. Defendant provides medical services to patients by assisting with the process of booking appointments with doctors and other providers as well as helping patients find the right provider. In order to do this, the patients who use the ZocDoc website provide Defendant with significant medical data to find the right provider, including symptom and previous diagnosis information.

29. Defendant's main source of revenue is derived from the subscriptions doctors paid (and now leads per patient) for the business that Defendant sends to their offices (both in-person and virtual). To date, this business model has been a success: Defendant had a $1.8 billion valuation in 2015 (and $130 million in funding raised) and now has a current annual revenue of approximately $240.8 million (and over $375.9 million in funding raised).[2][3] According to Defendant, its 'north star' is a simple philosophy: patients first.

[2] https://www.zocdoc.com/about/news/zocdocs-turnaround-from-an-unsustainable-path-to-profitable-growth/, (last accessed Jan. 9, 2025).

[3] https://growjo.com/company/Zocdoc, (last accessed Jan. 9, 2025).

30. By its very nature, Defendant – a business which is frequented by Plaintiffs and Class members – is the type of business that requires heightened levels of privacy. The collection of medical data is highly sensitive, which is why Defendant promises discretion both in the way it conducts its business as well as with respect to the data it collects through its website (and through other means). Including in its "privacy choices" page which states that "ZocDoc does not sell medical information." This can be seen below:



Zocdoc Help List your practice on Zocdoc Log in Sign up

Your privacy choices

Zocdoc does not sell your personal information. We are committed to respecting the privacy rights of all our users and work hard to protect the personal information and data entrusted to us.

Zocdoc is working to build the healthcare experience patients expect and deserve. To do this, we may collect certain personal information and other data to help improve and customize your experience using our website and apps. For example, we may collect your IP address to show you more relevant search results based on your location. Please note that because we only collect minimal information about users who visit Zocdoc but do not create an account, some of the rights below are expressly limited to Zocdoc account holders.

To learn more about how we approach privacy at Zocdoc, including the types of data we collect, see our Privacy Policy.

31. Indeed, Defendant initially seems to understand the critical nature of protecting patient data; but immediately contradicts itself

stating that they still collect some data to vaguely "help improve and customize your experience using our website and apps" and the privacy protections Defendant may provide are limited to actual accountholders.

32. Defendant makes privacy assurances and representations through its privacy choices page, which can be found at the very top its website: to reassure consumers that their visits to Defendant's website and the data that those consumers provide are protected. Privacy-based representations are material components of the services that Defendant has to offer through its website: Defendant knows this otherwise those representations (which, as discussed below, are false) and the manner in which those representations are made are done so to drive goodwill, website traffic, and patient trust to Defendant.

33. All the while, Defendant's actual Privacy Policy is nearly hidden in the outer limits of its website, tucked beneath Defendant's lower menu and page-ending disclaimers – hidden in dark text and requiring no consent by website users whatsoever. Moreover, although Defendant's privacy policy states that Defendant uses and shares personal information in certain circumstances and that their website utilizes data collection technologies, Plaintiffs and the Class members

cannot give informed consent for the collection and use of their data as the privacy policy is only made accessible after a user has already visited the site.

### *Defendant Allows for the Collection of PII by Third Parties Sans Consent*

34. Rather than keep this private information (the information collected as well as the datapoint that Plaintiffs had visited the ZocDoc website at all) protected, Defendant instead opted to make it available for collection and sale to other third parties.

35. Defendant either knew (and was likely profiting from) or should have known that third parties were using its website to collect advertising data. These third parties used either ad trackers to collect data on Plaintiffs and Class members, then used those ad trackers to serve digital advertisements to Plaintiffs and Class members either on various online platforms (like social media platforms) or on other websites spread throughout the internet.

36. For example, numerous third parties were revealed as collecting data or otherwise being present on a page which asked patients about their gynecological symptoms which appeared as follows:




37. The third parties present on this page on the ZocDoc website include: Outbrain, Branch.io, Sentry, SpeedCurve, and Google. The presence of these third parties (and the ultimate goal of collecting data in order to serve advertisements) can very readily be seen hidden in the website's code:

| Date | Type | Filter | URL | Tracker |
|---|---|---|---|---|
| 8:48:07 AM | cosmetic | ##a[onmousedown^="this.href='https://paid.outbrain.com/network/redir?"] | https://www.zocdoc.com | |
| 8:48:07 AM | cosmetic | ##a[onmousedown^="this.href='https://paid.outbrain.com/network/redir?"] | https://www.zocdoc.com/search?addres... | |




| Date | Type | Filter | URL | Tracker |
|---|---|---|---|---|
| 7:38:12 AM | cosmetic | ##[data-adblockkey] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-ad-width] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-ad-name] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-ad-module] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-ad-manager-id] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[class^="div-gpt-ad"] | https://www.zocdoc.com | |
| 7:38:12 AM | network (xhr) | ‖sentry.io^$3p | https://sentry.io/api/1236964/envelope/?sentry_version=7&sentry_key=3076cf214aff408eb940448dce715b3d&sentry_client=sentry.javascript.react%2F8.55.0 | Sentry (Sentry) |
| 7:38:11 AM | network (script) | ‖speedcurve.com^$3p | https://cdn.speedcurve.com/js/lux.js?id=68558293 | SpeedCurve |




| Date | Type | Filter | URL | Tracker |
|---|---|---|---|---|
| 7:38:12 AM | cosmetic | ##ins.adsbygoogle[data-ad-slot] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##ins.adsbygoogle[data-ad-client] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##div[id^="ezoic-pub-ad-"] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##div[id^="div-gpt-"] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##div[id^="dfp-ad-"] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##div[id^="ad_position_"] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##div[data-ad-targeting] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##div[aria-label="Ads"] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[name^="google_ads_iframe"] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[id^="div-gpt-ad"] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-revive-zoneid] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-advadstrackid] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-adblockkey] | https://www.zocdoc.com | |
| 7:38:12 AM | cosmetic | ##[data-ad-width] | https://www.zocdoc.com | |

38. Once these third parties acquire Plaintiffs and Class members' data, they can then use that data for a variety of purposes, including use for advertising (which is the primary purpose) but also for resale to additional downstream third-party purchasers who may have even less upstanding uses for the data collected. As can be seen in the code, ads are not only placed on the website page by Google

(##ins.adsbygoogle) but Sentry and SpeedCurve (which are both third party advertisers) are present on the page by virtue of what the code includes (^$3p). Sentry and SpeedCurve are both sending page data back to their own websites, which is why they both have URL's designated to do so.

39. Additionally, for the placement of advertisements on the website related to Google, the types of fields related to that advertising is readily viewable within the code of the website while searching for providers. For example, this is the code's collection when searching for mental healthcare providers in Brooklyn, New York.




40. It collects the following data points within the questionnaire: the type of services sought (mental health), the location of the person searching (Brooklyn, New York), their gender, insurance carrier,

language, and specialization of provider. All of this information is sensitive, and much of it is even more sensitive when combined with a user's internet protocol or other identifying data.

41. This sensitive information and identifying data is highly valuable, and because a variety of different end-users could have utilization for it, it maintains its value as it is collected, sold, and resold. Defendant allows for the collection of this data at its primary source: directly from Plaintiff and Class members themselves.

42. The reason that Defendant collects health related data is because it has an even higher value than ordinary data. For example, a data aggregator called Datarade.ai advertises access to vast amounts of data tied to individual U.S. citizens, including name, address, email address and telephone number as well as the information that the specific citizen was shopping for a prescription medication. The starting price for access to this data begins at $10,000. Other healthcare companies, like Pfizer, spend $12 million annually to purchase health data.

43. Here, Defendant used the data collected from its website users to serve personal advertisements – and many of these advertisers

would have no way of knowing that a potential patient was in the market for their services sans the datapoints sold by Defendant. The lifeblood for some of these businesses is their advertising: and the ability afforded to them by Defendant to know who potential consumers are is simply too good to resist – even to the detriment of patient privacy.

***The Implications of the Secret Collection of Health Data and Resale of that Information***

44. Defendant's conduct violates numerous laws as well as basic notions of consumer privacy (especially in the healthcare context).

45. ***Defendant's Conduct Violates HIPAA***. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which was passed in 1996, sets a floor for the care that healthcare providers in New York, California, and across the country are expected to provide in handling patient information. Patients reasonably expect that healthcare providers will handle their private health information in accordance with HIPAA requirements, including by refraining from sharing that information with ad tech companies. Additionally, by receiving ill-gotten private data, especially valuable PII, the advertisers each served as a conduit for Defendant to monetize this precious and private information.

46. In fact, in December 2022, the United States Department of Health and Human Services ("HHS") issued a revised bulletin "to highlight the obligations" of healthcare providers under the HIPAA Privacy Rule "when using online tracking technologies" such as those used by Defendant, which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application." The bulletin was updated in 2024.

47. In the bulletin, HHS confirmed that HIPAA applies to healthcare providers' use of tracking technologies like those developed and used by Defendant on its website. Among other things, HHS explained that healthcare providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information, even if no treatment information is included and even if the individual does not have a relationship with the healthcare provider:

> **How do the HIPAA Rules apply to regulated entities' use of tracking technologies?**
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use the regulated entities' website or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of

> appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates or types of healthcare services.

48. Additionally, HHS further clarified that HIPAA applies to healthcare providers with tracking technologies even on webpages and on mobile applications that do not require patients to login. This HHS bulletin did not create any new obligations but instead highlights obligations that have been in place for decades. Reasonable patients would expect that Defendant would comply with these obligations about information about the services rendered on Defendant's website.

49. ***Defendant's Conduct Violates the FTC Act***. Under Section 5 of the FTC Act and relevant jurisprudence, the Federal Trade Commission has the power to bring lawsuits against defendants who

invade and violate privacy rights – this extends to medical services providers who are defendants.

50. Recently, the FTC has brought a number of actions in federal court against corporations who secretly collect health-related data in the same manner as collected here (including (but not limited to) *United States of America v. GoodRx Holdings, Inc.*) as well as against corporations who aggregate data collected from third parties through the advertising exchange process, similar to here (including, but not limited to, *In the Matter of Mobilewalla, Inc.* and *In the Matter of Gravy Analytics, Inc.*). In each of these actions, the FTC has articulated that consumer protection statutes not only exist to redress privacy related harms, but that those same statutes specifically were intended to protect against the same conduct as alleged in this action. Consumer protection statutes follow Section 5 of the FTC Act and are applied in this Complaint as such.

51. ***Defendant's Conduct Offends Basic Privacy Rights***. Defendant's services, providing medical appointment booking services, comes with a reasonable expectation of privacy that exists because of the sensitive nature of the type of work that Defendant does. The same

holds true for patients who electronically walk into digital storefronts. These patients deserve the same privacy rights afforded to ordinary consumers who walk into physical medical services offices. This is especially true here, where Plaintiffs and Class members did not anticipate, invite, or adequately consent to the presence of other third-party corporations looking over their digital shoulders as they transact business with Defendant.

52. The identifying datapoints collected by Defendant (device identifiers, internet protocol address(es), usernames and login information, etc.) in tandem with the information that Plaintiffs accessed Defendant's website to procure services, on their own, is highly sensitive information.

53. Rather than protect this information, as well as other potential data collected (*e.g.*, personally identifiable information, protected health information, payment card and banking data, etc.), Defendant allows it to be collected, retained and used by third parties which lack sufficient consent from Plaintiffs and Class members to do so.

***The Value of Consumer Health Data***

54. Plaintiffs and Class members were harmed when Defendant invaded their privacy rights by making their data available for sale about their searches and medical inquiries on Defendant's website. Reasonable patients, who are consumers, would not have used Defendant's website had they known that their privacy rights would be invaded as a result.

55. PII is extremely valuable. There is a huge market for the data collected on Defendant's website. Plaintiff and Class members have suffered pecuniary losses when Defendant sold and allowed for the resale of their data to unauthorized third parties because of the value of the data itself.

56. In fact, the data at issue is so valuable, it is important to remember that Defendant is not only an intermediary for booking medical services appointments but is also a data aggregator. That is, part of Defendant's business model is the collection and sale of the data it collects. Without the freedom to control what becomes of their data, Plaintiffs and Class members are unable to maintain the value of this data and use it for whatever purposes they expressly authorize.

57. The value of consumers' PII is axiomatic.

58. Consumer personal information is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

***Defendant's Actions After the Filing of This Action***

59. This Action was filed on January 21, 2026. *See,* ECF No. 1. The Summons and Complaint were served on Defendant on March 4, 2026. ECF No. 10. Additionally, at the request of Defendant, a Fed. R. Civ. P. Rule Waiver of the Service of the Summons and Complaint was executed on March 13, 2026. ECF No. 13.

60. At a minimum, on March 4, 2026, Defendant was aware of the allegations in this Action, as well as the fact that the Privacy Policy's disclosures did not suffice in order to give Plaintiffs and Class members the meaningful information about the use of their PII.

61. On March 6, 2026 at 1:05 PM EST, two days after becoming aware of this Action, Defendant changed their Privacy Policy, Terms of Use, and Acceptable Use Policy. With respect to the Privacy Policy, the email (which is believed to have been sent to all users) states as follows:

> Our Privacy Policy includes updated information regard the data we collect and how we protect and use your personal

information. The policy also details your data rights and choices you can make in regards to your personal information.

62. This email appeared as follows:




63. Plaintiffs and Class members would be hard pressed not to see this conduct as an action taken in an effort to cut off liability for failing to make adequate disclosures.

64. ***Defendant's Privacy Choices Page.*** The Privacy Choices page (which is discussed below) gives consumers the option to limit

"unessential tracking" but Defendant does not disclose what that means, what information is collected when opting out of unessential tracking, and to whom that information is shared. Essentially, this "opt-out" mechanism is illusory and does not inform consumers what specifically they would be opting out of. At bottom, this opt out mechanism is inadequate because: (1) it exists within a hyperlink tucked at the bottom of the homepage, then inside of a dropdown screen and (2) consumers should not have to choose to opt out of having their privacy rights invaded – they should be able to choose to make informed decisions before opting in, which Defendant did not and does not offer to this day.

65. Additionally, prior to the filing of this litigation, Defendant gave the option in their "Privacy Choices" page to limit the use of sensitive personal information, including demographic data and protected health information, which appeared on December 13, 2025 in the Privacy Choices page as follows:

**Image 1: Privacy Choices Page on December 13, 2025**

Cookies and other trackers

Zocdoc uses cookies and other tracking technologies to deliver, improve and market our services to users. See our privacy policy to learn more about the information we collect and how we use it. If you choose to opt-out, Zocdoc will disable all unessential tracking technologies.

☐ Opt-out of all unessential tracking for this session

If you have a Zocdoc account, you can permanently opt-out of unessential tracking by logging into your Zocdoc account and updating your privacy settings.

Sensitive personal information

Zocdoc may collect certain personal information that can be considered sensitive, such as demographic data or information concerning your health. In order to improve our services, perform analytics, and continue to grow our platform, we may send some sensitive data to third-party vendors. These vendors are held to the same or substantially similar privacy and security standards to which we hold ourselves. If you are a resident of California or Utah, you have the right to limit the use of your sensitive personal information for certain purposes.

☐ Limit the use of sensitive personal information for your account

To permanently limit the use of sensitive personal information, log into your Zocdoc account and update your privacy settings.

66. However, after updating the Privacy Choices page following the filing of this Action, Defendant eliminated the option to limit the use of sensitive personal information on that same page – only giving users the right to “opt-out of all unessential tracking,” appearing as follows:

**Image 2: Privacy Choices Page on May 2, 2026**




67. At some point, Defendant must have decided that the illusory choice of being able to opt out of sharing sensitive health data and demographic information was not a choice they were willing to allow Plaintiffs and Class members to make. So, they eliminated it.

68. To make matters worse, both versions of the Privacy Choices page contain disclaimer language that nullify any compliance Defendant would need to adhere to consistent with Plaintiffs and Class members' privacy choices. Specifically, it states "[p]lease note that any of your

privacy choices described on this page and in our privacy policy may be subject to conditions, limitations, or exceptions as provided by applicable law [...]"[4]

69. ***Defendant's Privacy Policy Page.*** On March 4, 2026, Defendant purports to have updated their Privacy Policy – the Effective March 4, 2026 version (the "Updated Version") is still the applicable version on their website to this day.[5] A redlined version of the previous Privacy Policy (Effective Date: December 27, 2024) (the "Previous Version") to the Updated Version which was uploaded after this Action was commenced is attached as an Exhibit to this Complaint.[6]

70. The new disclosures made in the updated Privacy Policy are actually quite shocking – especially in light of the fact that it was updated after the commencement of this Action:

i. **Page 4**: On Page 4 of the Updated Version a new disclosure appeared which is at the very heart of the allegations in this Action: "[d]epending on how you use

[4] https://www.zocdoc.com/privacy-settings, (last accessed May 2, 2026).

[5] https://www.zocdoc.com/about/privacypolicy/, (last accessed May 2, 2026).

[6] **Exhibit A**, Privacy Policy Redline from December 27, 2024 Version to current March 4, 2026 Version.

the Services, we may disclose your Personal Data to third parties such as advertising partners. Such disclosures may constitute a "sale" or "sharing" to "third parties" for "targeting advertising" such as terms are defined under applicable U.S. privacy laws." This, of course, directly contradicts the language of the Privacy Choices page about not selling consumer data which have remained on the Defendant's website both before and after the commencement of this Action.

ii. **Page 5:** On Page 5, a chart with five columns discusses how Defendant uses data. Notably, the last column (column five) had the language changed from the Previous Version which stated "Third Parties with Whom We Disclose Data" and, in the Updated Version states "Third Parties to Whom We 'Sell' or 'Share' Personal Data." Suddenly, after the commencement of this Action, Defendant thought it would be necessary to disclose the parties that they sell and share personal data with, as opposed to sugarcoating column five as

being one that merely discusses disclosures of personal information. Column five also made it a point to reveal that the data being sold or shared would be to "certain analytics partners and advertising networks," which it previously defined as mere disclosures of personal data in column four. This data, which is collected for all visitors of the website whether they have an account with Defendant or not, includes IP address, IP-address based location data, device ID, domain servicer, type of device/operating system/browser used to access the services, web analytics, user demographic data (gender and date of birth), and location data.

iii. **Page 11:** Page 11 contains a chart which discusses protected health information – changing language from sharing of data with third parties to a more vague "disclosures of personal data." This data, which is provided to service providers, analytics partners, and healthcare providers, includes booking appointment data (appointment date/time, provider information, and

whether you are a new patient) – though, the Updated Version now revealed that the purpose for each visit would be disclosed to these third parties. This is extremely problematic because the purpose for a visit being disclosed almost always contains protected health information – like for Plaintiff Garcia who sought mental healthcare providers.

iv. **Page 12-13**: The next category in this chart is even more disturbing, as the Updated Version contains a new category of protected health information which was not in the Previous Version: the sharing of "reproductive or sexual health information." The Previous Version did not disclose this type of highly sensitive data collection, which was highlighted by the initial complaint from this Action and which is extremely dangerous to share with third parties given the state of reproductive health in the United States. To be clear, the chart reveals that this information is

shared with opaque, unnamed parties, like "service providers" whom are not expressly named.

v. **Page 17:** Here, Defendant adds a paragraph into the Updated Version about data retention which did not exist in the Previous Version. In no uncertain terms, the paragraph states that Defendant retains data with no definite deletion date, stating "[w]e retain Personal data about you as necessary to provide our Services or to perform our business or commercial purposes for collecting your Personal data. When establishing a retention period for specific categories of data, we consider who we collected the data from, our need for the Personal Data, why we collected the Personal Data, and the sensitivity of the Personal Data." Thus, there is no formal deletion schedule for Plaintiffs and Class members' PII.

vi. **Page 24:** On Page 24, Defendant newly discloses in its Updated Policy that it provides Plaintiffs and Class members' PII to artificial intelligence. Specifically, it

states "[w]e may use artificial intelligence ("AI") tools to enhance or operate certain functions of the Services, such as chat and customer service features. When you interact with our AI tools, we or the service providers we engage may process information automatically." A reasonable consumer would not assume that their PII and other sensitive information was being shared with AI, let alone unnamed AI "service providers."

vii. **Page 25:** On Page 25, Defendant essentially admits to the privacy violations which were made in the initial complaint: that there are tracking devices collecting information and surveilling Plaintiffs and Class members while they use Defendant's website. Specifically, the Updated Version newly discloses that Device and Browser Information (IP address, unique identifiers, browser type, device type, internet service provider, operating system, and mobile device's geographic location) and Usage Information (how the user interacts with the Defendant's website, including

the date and time of use, the pages viewed, the areas of the website viewed, the amount of time on pages, whether a booking is completed, keystrokes, mouse movements, form field entries, recording of chat sessions, and use of inputs to other AI-supported tools, which "may include 'session replay' tools." All of this, from a privacy perspective is highly problematic because it gives third parties significant data points about consumers (such as their location), what they do on the website when seeking medical care, and the entries they type into the website which may contain very sensitive information. To compound these issues, Defendant newly admits to the use of "session replay" tools, which is the equivalent of allowing the entire session of a respective website user to be recorded and played back – unbeknownst to them until this new Updated Version was released, assuming they even see the 38-page Privacy Policy tucked at the bottom of the homepage at all.

viii. **Page 32:** Incredibly, on Page 32, a new section added into the Updated Version states "[w]e do not sell or share Sensitive Personal Data for monetary consideration" which is proven false by Defendant's own contradictory statements and the code on the website itself – including on page 35 where it states that consumers can "opt-out of sales and sharing" of data.

ix. **Page 37:** On Page 37, Defendant states that while they do not maintain persistent identifiers to associate requests regarding their data, they too can "opt out of sales and sharing" of their data as well. The only way a consumer can opt out of their personal data is if the collector of the data knows who they are in the first instance.

71. Defendant does not get to suddenly confess to all of their data privacy violations and they evaporate merely because they have updated their Privacy Policy. In fact, the Updated Version is even more unclear and opaque than the Previous Version – and all of the harm that was

done by not disclosing these practices, assuming they were disclosed properly, occurred prior to revising the Privacy Policy. This means, at a minimum, Plaintiffs and Class members who used the Defendant's website to book medical appointments did not have adequate warnings about the sharing and sale of their data. The Updated Version of the Privacy Policy is tantamount to numerous admissions about what the initial version of the complaint in this Action was already alleging. And the fact that the revisions to the Privacy Policy were made after Defendant was made aware of this Action shows that this Action was responsible for changing Defendant's conduct.

***Harm to Patients***

72. Plaintiffs and Class members provided their data to Defendant to obtain information regarding the medical services that Defendant provides – services which happen to be highly personal and very private. This information was disclosed to and intercepted by the third-parties as listed herein through ad tracking technology. This information was collected and intercepted for business purposes, including to serve targeted advertising.

73. Plaintiffs did not consent to the interception or disclosure of their data to these third parties, or to anyone else. As such, Plaintiffs have suffered from the type of privacy-centric harms that a patchwork of privacy protections which federal, state, and common law principles were intended to collectively protect against.

## CLASS ACTION ALLEGATIONS

74. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes (collectively, the "Class"):

> **Nationwide Class:** All natural persons in the United States who used the Defendant's website and/or mobile application and whose communications and/or data was shared with third parties during the applicable statutory period.
>
> **California Sub-Class.** All natural persons in the state of California who used the Defendant's website and/or mobile application and whose communications and/or data was shared with third parties during the applicable statutory period.
>
> **New York Sub-Class:** All natural persons in the state of New York who used the Defendant's website and/or mobile application and whose communications and/or data was shared with third parties during the applicable statutory period.

75. Excluded from the Class are: (1) any Judge or Magistrate

presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

76. ***Numerosity***. The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands or even millions of individuals, and the members can be identified through Defendant's records.

77. ***Predominant Common Questions***. The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. Whether Defendant violated Plaintiffs' and Class members' privacy rights;

b. Whether Defendant violated the Electronic Communications

Privacy Act;

c. Whether Defendant's acts and practices violated state consumer protection laws;

d. Whether Defendant's conduct is a breach of implied contract;

e. Whether Defendant's conduct violates California privacy laws;

f. Whether Defendant was unjustly enriched;

g. Whether Plaintiffs and the Class are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and,

h. Whether Plaintiffs and the Class are entitled to actual, statutory, punitive and/or other forms of damages, and other monetary relief.

78. ***Typicality***. Plaintiffs' claims are typical of the claims of the other members of the Class and arise from the same conduct by Defendant and are based on the same legal theories.

79. ***Adequate Representation***. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced

in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any victim. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

80. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

81. Plaintiffs may revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## FIRST CAUSE OF ACTION

## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
## 18 U.S.C. § 2510 *et seq.*
(ON BEHALF OF THE NATIONWIDE CLASS)

82. Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

83. The Electronic Communications Privacy Act ("ECPA") makes it illegal intentionally to intercept, or attempt to intercept, any wire, oral, or electronic communication and to disclose or use the contents of an unlawfully intercepted communication. 18 U.S.C. § 2511.

84. ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

85. Defendant intentionally intercepted electronic communications that Plaintiffs and the Class members exchanged with Defendant through the tracking tools installed on its website.

86. The transmission of data between Plaintiffs and the Class members and Defendant qualify as communications under ECPA. 18 U.S.C. § 2510(12).

87. Defendant contemporaneously intercepted and transmitted Plaintiffs' and the Class members' communications of that data to the

dozens of advertising technology companies whose trackers Defendant installed or allowed to be installed on its website.

88. The trackers that Defendant uses to track Plaintiffs' and the Class members' communications, Plaintiffs' and the Class members' browsers, Plaintiffs' and the Class members' computing devices, and the code that Defendant placed or allowed to be placed on its website are all "devices" within the meaning of 18 U.S.C. § 2510(5).

89. The ad tech companies that are the recipients of communications between Plaintiffs and the Class members, on the one hand, and Defendant, on the other, are not party to those communications.

90. Defendant transmits the contents of those communications through the surreptitious redirection of the communications from Plaintiffs and the Class members' computing devices.

91. Plaintiffs and the Class members did not consent to the ad tech companies' acquisition of their communications with Defendant. Nor did the ad tech companies receive adequate legal authorization to receive such communications.

92. In disclosing the content of Plaintiffs' and the Class members'

communications relating to the purchase and use of Defendant's products, Defendant had a purpose that was tortious, criminal, and designed to violate statutory and constitutional privacy provisions including:

a. The unauthorized disclosure of individually identifiable health information is tortious in and of itself, regardless whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use. Defendant intentionally committed a tortious act by disclosing individually identifiable health information without authorization to do so;

b. Intrusion upon Plaintiffs' and the Class members' seclusion;

c. Trespass upon Plaintiffs' and the Class members' personal and private property; and

d. Violation of 18 U.S.C. §§ 1343 (fraud by wire, radio, or television) and 1349 (attempt and conspiracy) which prohibit a person from "devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or

promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate … commerce, any writing, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice."

93. The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: (1) that the defendant voluntarily and intentionally devised a scheme to defraud another out of money or property; (2) that the defendant did so with intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were used. The attempt version of the statute provides that penalties apply to attempts as well as offenses. 18 U.S.C. § 1349.

94. Defendant's scheme or artifice to defraud consists of the false and misleading statements in its privacy policy described herein.

95. Defendant acted with intent to defraud in that it willfully invaded and took Plaintiffs' and the Class members' property, including the property rights to their individually identifiable health information and their right to determine whether such information remains confidential; the right to determine who may collect and use such

information for marketing; and the right to determine who has access to their devices and communications.

96. Defendant also acted with intent to defraud in that it willfully invaded and took Plaintiffs' and the Class members' property (their PII) with knowledge that it lacked consent or authorization to do so; a reasonable consumer would not understand that Defendant was collecting and transmitting their data to third parties; a reasonable consumer would be shocked to realize the extent of Defendant's disclosure of health data to third parties; and the subsequent use of health information for marketing was a further invasion in that the use was not related to any healthcare.

97. Defendant acted with the intent to acquire, use, and disclose Plaintiffs' and the Class members' PII without their authorization or consent.

98. Plaintiffs and the Class members have suffered damages because of Defendant's violations of ECPA, including that (1) Defendant eroded the essential, confidential nature of the relationship between Defendant and its patients, (2) Defendant derived valuable benefits from using and sharing Plaintiffs' and the Class members' communications

without their knowledge or informed consent and without providing compensation, (3) Defendant's actions deprived Plaintiffs and the Class members of the value of their PII, (4) Defendant's actions diminished the value of Plaintiffs' and the Class members' property rights in their PII; and (6) Defendant violated Plaintiffs' and the Class members' privacy rights by sharing their PII for commercial use.

99. Plaintiffs and the Class members seek appropriate declaratory or equitable relief including injunctive relief, actual damages and profits enjoyed by Defendant due to the violations or the appropriate statutory measure of damages, punitive damages, and reasonable attorneys' fees and costs. 18 U.S.C. § 2520. Pursuant to 18 U.S.C. § 2520, Plaintiffs and the Class members seek monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by Defendant due to the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

100. Unless enjoined, Defendant will continue to commit the violations of law described herein.

## SECOND CAUSE OF ACTION

**VIOLATIONS OF NEW YORK'S
DECEPTIVE TRADE PRACTICES ACT
N.Y. GEN. BUS. LAW §349**
(ON BEHALF OF BOTH THE NATIONWIDE CLASS
AND STATE SUBCLASSES)

101. Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

102. Defendant is considered a 'businesses' under New York General Business Law 349 ("GBL 349").

103. Defendant's business acts and practices are unfair and deceptive under GBL 349. New York (as well as other states through their respective unfair and deceptive trade practices statutes) has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendant violated GBL 349 by, among other things, disclosing and intercepting Plaintiff Granados' and Class members' sensitive data, including Private Information, without consent.

104. Defendant further engaged in unfair business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third

parties, which deceived and misled users of Defendant's platform.

105. Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Defendant secretly disclosing, intercepting, and misusing Plaintiffs' and Class members' sensitive and highly valuable personal data is significant, and there is no corresponding benefit resulting from such conduct.

106. Finally, because Plaintiff Granados and Class members were completely unaware of Defendant's conduct, they could not have possibly avoided the harm.

107. Indeed, although Defendant's privacy policy states that Defendant uses and shares personal information in certain circumstances, Plaintiff Granados and the Class members cannot give informed consent for the collection and use of their data as the privacy policy is only made accessible after a user has already visited the site.

108. By unlawfully disclosing and intercepting this data, Defendant has taken money or property from Plaintiff Granados and Class members.

109. Plaintiff Granados and the Class Members seek all available damages under applicable state consumer protection laws, including statutory damages of $50 per violation under GBL 349.

**<u>THIRD CAUSE OF ACTION</u>**

**VIOLATIONS OF CALIFORNIA'S**
**UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
(ON BEHALF OF THE CALIFORNIA SUBCLASS)

110. Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

111. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

112. Defendant engaged in unfair business practices by deploying tracking technology for the purpose of collecting Plaintiff Garcia's and California Class members' private data to share with third parties for profit.

113. Defendant engaged in deceptive practices by falsely claiming that it does not sell data and by falsely claiming that all consumer identifying information and other data in its privacy choices page. In fact, Defendant does sell access to consumer data, much of which was

collected using inconspicuous tracking technology. Failing to disclose these practices constitutes false statements and/or material omissions of fact. Had Plaintiff Garcia known that Defendants were intercepting and monetizing their communications and data, Plaintiff Garcia would have avoided doing business with Defendant.

114. Defendant engaged in unlawful acts and practices by violating each of the laws described herein, including Cal. Penal Code § 631 and the common law right to privacy.

115. Plaintiff Garcia and California Class members were completely unaware of Defendant's conduct and could not have anticipated these intrusions into their privacy through these unlawful, unfair, and deceptive practices. Accordingly, Plaintiff Garcia and Class members could not avoid the harm caused by Defendant.

116. Defendant's conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff Garcia and California Class Members. The gravity of harm of Defendants' secret collection, disclosure and use of Plaintiff Garcia and California Class members' personal information and private data is significant, and there is no corresponding benefit from such conduct.

117. As a result, Plaintiff Garcia and California Class members suffered a loss of property in the form of privacy violations, loss of control over their valuable data, and a failure to be compensated for the data collected and sold.

118. Defendant reaped unjust profits and revenues in violation of the UCL as a result of its unlawful and unfair conduct, including profits and revenues from its use of Plaintiff Garcia and California Class Members' data in its targeted advertising and other services. Plaintiff Garcia and Class Members seek restitution and disgorgement of these unjust profits and revenues.

119. Plaintiff Garcia and California Class Members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

## FOURTH CAUSE OF ACTION

## VIOLATIONS OF THE RIGHT TO PRIVACY ART. 1 (§ 1) OF CALIFORNIA'S CONSTITUTION

(ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)

120. Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

121. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1. Plaintiff Garcia is a California resident whose privacy rights are protected by the California Constitution.

122. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of her privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

123. The right to privacy in California's constitution creates a right of action against private and government entities.

124. Plaintiff Garcia and California Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution. The manner in which Defendant intercepted this information —surreptitiously and without obtaining consent — defeating established privacy-mechanisms and social norms.

125. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there is an entity intercepting, monitoring, monetizing, and disclosing their online activity, let alone on a medical services website.

126. Defendant's conduct violated the privacy of California Class Members, including Plaintiff Garcia, Defendant did not have consent to intercept their PII, let alone use it to profile and target Plaintiff Garcia and California Class Members.

127. Plaintiff Garcia and California Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Defendant as a result of its intrusion upon seclusion.

128. Defendant's conduct was intentional, knowing, and carried out with a conscious disregard for Class Members' rights, therefore Plaintiff Garcia and California Class members are entitled to punitive and exemplary damages.

129. Plaintiff Garcia and California Class Members also seek any other relief the Court may deem just and proper.

## FIFTH CAUSE OF ACTION

## VIOLATIONS OF THE CALFORNIA INVASION OF PRIVACY ACT ("CIPA") CAL. PENAL CODE §§ 631, 632

(ON BEHALF OF THE CALIFORNIA STATE SUB-CLASS)

130. Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

131. CIPA § 631 prohibits any person who, but means of any "machine, instrument or contrivance" or in "any other manner": (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learns the contents or meaning of any message, report or communication while the same is in transit or passing over any wire, line or cable, or is being sent from, or

received at any place" within California; (3) "uses or attempts to use, in any manner, or for any purposes, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

132. Defendant is a person under CIPA § 631.

133. Defendant designed, created, conspired, and effectuated the interception and use of Plaintiff Garcia and Class Members' personally identifiable information and private communications in California because (1) Plaintiff Garcia is based in California, where Defendant intercepted her PII; (2) it collected medical information on patients in California, including Plaintiff Garcia; and (3) it partners and cooperates with companies in California —to use these user profiles, including those maintained on California citizens.

134. Defendant's technology and Plaintiff Garcia and Class Members' computers, mobile devices, and connected TVs, are a "machine, instrument, contrivance, or . . . other manner" under CIPA § 631.

135. At all relevant times, Defendant used its technology to make

unauthorized connections with the lines of communication and instruments used by Plaintiff Garcia and Class members to access online services without the consent of all parties to those communications.

136. Defendant willfully, and without consent, read, or attempted to read, or learn the contents and meaning of Plaintiff Garcia and Class members communications with online services while those communications were in transit or passing over a wire, line, or cable, or were being sent or received within California through its tracking technology, as described herein. This interception happened prior to or at the same time that the communications were received by the intended recipient.

137. Defendant used and attempted to use these identifiable, private communications without consent for its own benefit, including for data enrichment, profiling, and to facilitate targeted advertising — all for profit.

138. The interception and use of Plaintiff Garcia and Class Members' communications was without adequate authorization or consent from Plaintiff Garcia and Class Members.

139. Plaintiff Garcia and Class members have been harmed

because of Defendants' conduct. Their PII and sensitive information has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiff Garcia and Class members face an imminent threat of continued injury, as this data is still stored and used, such that Plaintiff Garcia and Class members have no adequate remedy at law.

140. Plaintiff Garcia and Class members seek statutory damages in accordance with CIPA § 637.2(a) which provides the greater of: (1) $5,000 per violation or (2) three times the amount of damages suffered by Plaintiff Garcia and Class members in an amount to be proven at trial, as well as equitable and injunctive relief.

## SIXTH CAUSE OF ACTION

### BREACH OF IMPLIED CONTRACT
(ON BEHALF OF BOTH THE NATIONWIDE CLASS AND STATE SUBCLASSES)

141. Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

142. Plaintiffs and Class members each respectively entered an implied contract with Defendant when they accessed Defendant's website and/or mobile application. Specifically, this implied contract is an agreement by Defendant to safeguard information given to them by

Plaintiffs and Class members: especially PII.

143. Plaintiffs and Class members had a reasonable expectation that Defendant would keep their PII confidential. Additionally, Plaintiffs and Class members believed that Defendant would use part of the data provided to Defendant to keep their PII confidential.

144. Plaintiff and Class members would not have provided nor entrusted Defendant with their PII had they known that Defendant had no intention of keeping this implied contract.

145. As a direct and proximate cause of Defendant's breach of implied contract, Plaintiffs and Class members sustained actual losses and damages as described in detail above, including that they did not get the benefit of their bargain for which they paid and were overcharged by Defendant for its services.

146. Plaintiffs and Class members request all forms of damages stemming from these breaches, including nominal damages.

## SEVENTH CAUSE OF ACTION

**NEGLIGENCE/NEGLIGENCE PER SE**
(ON BEHALF OF BOTH THE NATIONWIDE CLASS
AND STATE SUBCLASSES)

147. Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

148. Plaintiffs and Class members gave Defendant sensitive, nonpublic personal information. This information included PII, as discussed above.

149. While Defendant's conduct was intentional as alleged, it was at a minimum (and in the alternative) negligent.

150. By collecting, storing, using, and profiting from this data, Defendant owed a duty of care to Plaintiffs and Class members to exercise reasonable care in keeping this information confidential.

151. Defendant had common law duties to prevent foreseeable harm to Plaintiffs and Class members. These duties existed because Plaintiffs and Class members were foreseeable and probably victims of any disclosure of this PII sans adequate consent.

152. Defendant's duties to protect the confidentiality of Plaintiffs' and Class members nonpublic information, including PII, also arose from

the special relationship that existed between each Plaintiff, Class member, and the Defendant – as between patient and a medical service provider. Defendant alone could have ensured that it did not disclose the nonpublic personal information, including PII and PHI without consumers' consent.

153. Defendant knew or should have known that by integrating the tracking technologies on Defendant's website that it was systemically disclosing PII to third parties.

154. But for Defendant's conduct, Plaintiffs' and Class members' PII would not have been disclosed without consent and, as a direct and proximate cause of this conduct, Plaintiffs and Class members have been injured and are entitled to damages in an amount to be proven at trial.

155. Plaintiffs and Class members seek to recover the value of the unauthorized access to their PII resulting from Defendant's wrongful conduct. The measure of damages in this instance is analogous to the unauthorized use of intellectual property. Like a technology covered by a patent or protected by a trade secret, use or access to a person's PII is non-rivalrous – the unauthorized use by another does not diminish the rights-holders' ability to practice the patented invention or use the

protected trade secret technology. Nevertheless, a plaintiff may generally recover the reasonable use value of their most valuable intellectual property: their PII. Especially here, where that PII release can result in terrible consequences for Plaintiffs and Class members.

156. This measure is appropriate because (a) Plaintiffs and Class members have a protectable property interest in their PII; (b) the minimum damages value for the unauthorized use of personal property is its rental value; and (c) rental value is established with respect to market value (*i.e.,* evidence regarding the value of similar transactions). Put differently, the value of the data is equivalent to whatever the unauthorized third parties pay for that respective data.

157. As such, Plaintiffs seek damages in an amount to be proven at trial.

158. Plaintiffs also seeks such other relief as the Court may deem just and proper.

159. Where allowable, in addition to or alternatively to this count, Plaintiffs pleads a Negligence Per Se count because Defendant's conduct violates HIPAA as well as Section 5 of the FTC Act.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Class respectfully requests that the Court enter an order:

A. Certifying the Class and appointing Plaintiffs as the Class' representatives;

B. Finding that Defendant's conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Defendant;

D. Awarding such injunctive and other equitable relief as the Court deems just and proper, including injunctive relief;

E. Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F. Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

G. Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

160. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: May 2, 2026

Respectfully Submitted,

/s/ *Blake Hunter Yagman*
Blake Hunter Yagman
*blake.yagman@yagmanpllc.com*
**YAGMAN PLLC**
The Foundry Building
1050 30th Street, N.W.
Georgetown, Washington D.C. 20007
Telephone: 929-709-1493

*Attorney for Plaintiff Garcia, Granados and the Proposed Classes*